**GOOD GUSTAFSON AUMAIS LLP**
J. Ryan Gustafson (Cal. Bar No. 220802)
2330 Westwood Blvd., No. 103
Los Angeles, CA 90064
Tel: (310) 274-4663
jrg@ggallp.com

**SHENAQ PC**
Amir Shenaq, Esq.*
3500 Lenox Road, Ste. 1500
Atlanta GA 30326
Tel: (888) 909-9993
amir@shenaqpc.com

**THE KEETON FIRM LLC**
Steffan T. Keeton, Esq.*
100 S Commons, Ste 102
Pittsburgh PA 15212
Tel: (888) 412-5291
stkeeton@keetonfirm.com

*Pro hac vice* forthcoming

*Counsel for Plaintiff and the Proposed Class*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| Annemarie Lott, individually, and on behalf of those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>S.C. Johnson & Son, Inc. and Oars + Alps, LLC,<br><br>Defendants. | CASE NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>**Demand for Jury Trial** |

Plaintiff Annemarie Lott brings this action on behalf of herself and all others similarly situated against Defendants S.C. Johnson & Son, Inc. ("SCJ") and Oars + Alps LLC ("Oars," and collectively "Defendants"). Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## **NATURE OF THE ACTION**

*"I think 'fake it 'til you make it' is just an injection of confidence…
[t]hat initial mentality really did help Oars + Alps at the onset."*

*Mia Duchnowski
Co-Founder of Oars + Alps*[1]

1.   This case arises from Defendants' deceptive and misleading practices with respect to their marketing and sale of Oars + Alps® brand cosmetic and beauty products (collectively, the "Product" or "Products").[2]

2.   Defendants manufacture, market, and sell their Products throughout the United States including the State of California.

---

[1] Reid, Pauleanna. *Built And Bought In 3 Years: How The Women Behind Oars + Alps Brought Big Beauty To Masculine Hands*, FORBES (Mar. 31, 2020), https://www.forbes.com/sites/pauleannareid/2020/03/31/built-and-bought-in-3-years-how-the-women-behind-oars--alps-brought-big-beauty-to-masculine-hands/.

[2] At the time of this filing, the following Oars + Alps products are included in this definition: Natural Deodorant, Natural Face Moisturizer + Eye Cream, Natural Wake Up Eye Stick with Caffeine, Natural Charcoal Solid Face Wash, Natural Wake Up Face Serum, and Natural Body + Face Wash. This definition is not exhaustive, and shall include all of Defendants' products that are similarly deceptively marketed.

GOOD GUSTAFSON AUMAIS LLP

3.     Oars + Alps was launched in 2015 by Laura Lisowski Cox and Mia Duchnowski with the purpose of creating "a men's skincare line that offers affordable, all natural products."[3]

4.     Despite the representations made on the Products' labels, marketing, and advertising which lead reasonable consumers to believe that the Products are "natural," they are not.

5.     In fact, this was admitted by Co-Founder Mia Duchnowski in a March 2019 interview where she stated:[4]

> We quickly found out that men actually don't know the difference between natural and organic. Nine times out of ten, if you ask somebody, they don't know. And so as such, there was no willingness to pay for organic products. And therefore, **our products are actually not made with natural ingredients**, and not necessarily made with organic ingredients, although we do have some products that have organic ingredients. The goal of this was to really understand the mindset of the consumer, to understand what they were willing to pay for these products....

6.     From their focus on the "natural" market, Founders Laura Lisowski Cox and Mia Duchnowski grew the Oars + Alps brand into a *financially* successful health, beauty, and cosmetic company.

---

[3] Elkins, Kathleen, *Why two women left high-profile corporate jobs to launch a skincare line for men*, CNBC (Jan. 18, 2017), https://www.cnbc.com/2017/01/18/two-women-left-jobs-at-facebook-and-bloomberg-to-sell-skincare-for-men.html.

[4] Richie Siegel, Role Reversal — with Mia Duchnowski of Oars + Alps Loose Threads (2022), https://www.stitcher.com/show/loose-threads-inside-the-fashion-business/episode/role-reversal-with-mia-duchnowski-of-oars-alps-59678558 (last visited May 27, 2022) at approximately 4:05 timestamp (emphasis added).

CLASS ACTION COMPLAINT

GOOD GUSTAFSON AUMAIS LLP

7.    With this rapid growth in mind, Defendant SCJ acquired Defendant Oars in 2019 for $20MM.[5]

8.    The brand's growth was not by accident, and instead developed from specifically targeting the "natural" market with intense focus.

9.    As Co-Founder Laura Lisowski Cox describes, "We are very data-centric from the product development piece to the marketing piece. We're looking at where are our guys are living and breathing. How do we reach them? Then, with messaging, we're constantly testing. We look at Google keywords, Amazon keywords, industry reports."[6]

10.    Defendants marketing efforts stress the purported "natural" nature of their Products.

11.    Notably, the principal display panel of all of the Products states "Natural."

---

[5] This amount is currently in dispute in an action against Defendant Oars and its co-founders where early investors allege that the co-founders misrepresented the true sales price. *See Levy Fam. Invs., LLC v. Oars + Alps LLC*, 2022 WL 245543 (Del. Ch. Jan. 27, 2022) (early investors allege that they learned from "a news article reporting that the Company was sold for $20 million, not $8.85 million as represented").

[6] McCormack, Claire. *Full Disclosure: How Oars + Alps Went From Launch To Exit In Less Than 36 Months*, BEAUTYINDEPENDENT (Oct. 28, 2019), https://www.beautyindependent.com/how-oars-alps-went-from-launch-exit-36-months-s-c-johnson/.

GOOD GUSTAFSON AUMAIS LLP



12.     The word "Natural" is a representation to a reasonable consumer that the Products contain only natural ingredients.

13.     This represents that the Product is "natural" to consumers.

14.     Reasonable consumers, including Plaintiff,  interpret "natural" to mean that the product does not include synthetic ingredients.

15.     Despite this representation, the Products are not natural because they include multiple synthetic ingredients.

16.     Specifically, the Products contain the following synthetic ingredients: Phenoxyethanol, Dimethicone, Caprylyl Glycol, Potassium Sorbate, Sodium Benzoate, Propanediol, Ethylhexylglycerin, and Citric Acid.

17.     Plaintiff and those similarly situated ("Class Members") relied on Defendants' misrepresentations that the Products are "natural" when purchasing the Products.

18. This deception is not limited to the Products' labels, and rather, it is omnipresent throughout Defendants' marketing efforts.

19. Reasonable consumers purchased the Products believing, among other things, that they were accurately represented. Specifically, reasonable consumers believed that the Products contained accurate label information and representations. Reasonable consumers would not have purchased the Products if they had known about the misrepresentations or would have purchased them on different terms.

20. Plaintiff brings this action individually and on behalf of those similarly situated and seeks to represent a Nationwide Class and a California Class. Plaintiff seeks damages, interest thereon, reasonable attorneys' fees and costs, restitution, other equitable relief, and disgorgement of all benefits Defendants have enjoyed from its unlawful and/or deceptive business practices, as detailed herein. In addition, Plaintiff seeks injunctive relief to stop Defendants' unlawful conduct in the labeling and marketing of the Products.

21. Defendants' conduct violated and continues to violate, *inter alia*, the consumer protection statutes of California. Defendants have been and continue to be unjustly enriched. Accordingly, Plaintiff brings this action against Defendants on behalf of herself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## JURISDICTION AND VENUE

22. This Court has personal jurisdiction over Defendants. Defendants purposefully avail themselves of the California consumer market and distributes the

GOOD GUSTAFSON AUMAIS LLP

Products to many locations within the state, where the Products are purchased by hundreds of consumers every day.

23.     This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed Plaintiff's class and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff alleges that the total claims of individual members of the proposed Classes (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

24.     Venue is proper in this District under 28 U.S.C. § 1391. Plaintiff's purchases of Defendants' Products, substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature, quality, and/or ingredients of the Products, occurred within this District and the Defendants conduct business in this District.

## PARTIES

25.     Plaintiff Annemarie Lott is a citizen of California who purchased the Products during the class period, as described herein. Plaintiff's purchases took place in California. In addition, the advertising and labeling on the package of the Products purchased by Plaintiff, including the "natural" representations, is typical of the advertising and labeling of the Products purchased by members of the Class. Plaintiff relied on the representation on the packaging that the Products were "natural."

GOOD GUSTAFSON AUMAIS LLP

**a.** Within the past three years, Plaintiff purchased multiple Products. These purchases were made at retailers throughout California. Most recently in March 2021, Plaintiff purchased Defendants' Natural Deodorant from the Target store in Roseville, CA at a price of approximately $14.00.

26.     Defendant S.C. Johnson & Son, Inc. is a Delaware corporation with its principal place of business in Racine, Wisconsin.

27.     Defendant Oars + Alps LLC is a Delaware company with its principal place of business in Chicago, Illinois.

28.     Defendants produce, market and distribute the Products in retail stores throughout the United States including stores physically located in the State of California.

29.     At the time of this filing, there is a dispute[7] involving Founders Laura Lisowski and Mia Duchnowski and early investors concerning the distributions, ownership, and other matters related to Defendant Oars its acquisition by Defendant SCJ in Delaware. To the extent that proper defendants may change as a result of the Delaware litigation, Plaintiff reserves the right to amend.

30.     Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendants who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

---

[7] *Supra* note 5.

31.    Whenever reference is made in this Complaint to any representation, act, omission, or transaction of a defendant, that allegation shall mean that the defendant did the act, omission, or transaction through its officers, directors, employees, agents, and/or representatives while they were acting within the actual or ostensible scope of their authority.

**FACTS**

A.  **Consumers Value Representations that a Product is Natural**

32.    Consumers have become increasingly concerned about the effects of synthetic and chemical ingredients in food, cleaning products, bath and beauty products and everyday household products.[8]

33.    Companies such as the Defendants have capitalized on consumers' desires for purportedly "natural products."

34.    Indeed, consumers are willing to pay, and have paid, a premium for products branded "natural" over products that contain synthetic ingredients.

35.    In 2015, sales of natural products grew 9.5% to $180 billion.[9] Reasonable consumers, including Plaintiff and Class Members, value natural products for

[8] Julianna M. Butler & Christian A. Vossler, *What is an Unregulated and Potentially Misleading Label Worth? The case of "Natural"-Labelled Groceries*, Environmental & Resource Economics, Springer; European Association of Environmental and Resource Economists, vol. 70(2), pages 545-564 (2017).

[9] *Natural Products Industry Sales up 9.5% to $180bn Says NBJ*, FOOD NAVIGATOR, http://www.foodnavigator-usa.com/Markets/EXPO-WEST-trendspotting-organics-natural-claims/(page)/6 ; *see also* Shoshanna Delventhal, *Study Shows Surge in Demand for "Natural" Products*, INVESTOPEDIA (February 22, 2017), http://www. investopedia.com/articles/investing/022217/study-shows-surge-demand-natural-products.asp  (Study by Kline Research indicated that in 2016, the personal care market reached 9% growth in the U.S. and 8% in the U.K. The trend-driven natural and organic personal care industry is on track to be worth $25.1 million by 2025).

GOOD GUSTAFSON AUMAIS LLP

important reasons, including the belief that they are safer and healthier than alternative products that are not represented as natural.

36.     Further, consumers have become increasingly concerned about the effects of synthetic ingredients in consumer products.[10]

37.     Reasonable consumers, including Plaintiff and Class Members, value natural products for important reasons, including the belief that they are safer and healthier than alternative products that are not represented as natural.

38.     As a result, "natural" products are worth more than products that contain artificial ingredients, and consumers pay a premium for products labeled "natural" over products that contain synthetic ingredients.

### B.  <u>**Plaintiff and Other Reasonable Consumers Understand Natural to Mean that a Product Lacks Artificial Ingredients**</u>

39.     Plaintiff and Class Members understand "natural" representations to mean that a product lacks synthetic ingredients.

40.     This interpretation is consistent with the understanding of a reasonable consumer.

41.     The test to determine if a company's "natural" representation is deceptive is judged by whether it would deceive or mislead a reasonable person. To assist in ascertaining what a reasonable consumer believes the term "natural" means, one can look to regulatory agency guidance.

42.     Federal agencies have warned companies that they must ensure that they can substantiate "natural" claims.

---

[10] Butler and Vossler, *supra* note 8.

GOOD GUSTAFSON AUMAIS LLP

43.     In 2013, the United States Department of Agriculture ("USDA") issued a Draft Guidance Decision Tree for Classification of Materials as Synthetic or Nonsynthetic (Natural). In accordance with this decision tree, a substance is natural—as opposed to synthetic—if: (a) it is manufactured, produced, or extracted from a natural source (i.e. naturally occurring mineral or biological matter); (b) it has not undergone a chemical change (i.e. a process whereby a substance is transformed into one or more other distinct substances) so that it is chemically or structurally different than how it naturally occurs in the source material; or (c) the chemical change was created by a naturally occurring biological process such as composting, fermentation, or enzymatic digestion or by heating or burning biological matter.[11]

44.     The FTC has warned companies that the use of the term "natural" may be deceptive: [12]

> Marketers that are using terms such as natural must ensure that they can substantiate whatever claims they are conveying to reasonable consumers. If reasonable consumers could interpret a natural claim as representing that a product contains no artificial ingredients, then the marketer must be able to substantiate that fact.

45.     Likewise, the Food and Drug Administration ("FDA") warns that any "natural" labeling on products must be "truthful and not misleading."[13]

46.     In April 2016, the FTC settled with four manufacturers and filed a complaint against a fifth company for representing that its products were "natural"

---

[11] U.S. Department of Agriculture, Draft Guidance Decision Tree for Classification of Materials as Synthetic or Nonsynthetic, March 26, 2013, *available at* https://web.archive.org/web/20140818174458/http://www.ams.usda.gov/AMSv1.0/getfile?dDocName=STELPRDC5103308.

[12] 75 Fed. Reg. 63552, 63586 (Oct. 15, 2010).

[13] U.S. Food and Drug Administration, Small Business & Homemade Cosmetics: Fact Sheet, *available at* http://www.fda.gov/Cosmetics/ResourcesForYou/Industry/ucm388736.htm#7.

GOOD GUSTAFSON AUMAIS LLP

when they contained Phenoxyethanol and other synthetic ingredients. The manufacturers agreed to cease marketing the products in question as being "natural."[14]

47.    Surveys and other market research, including expert testimony Plaintiff intends to introduce, will demonstrate that the term "natural" is misleading to a reasonable consumer because the reasonable consumer believes that the term "natural," when used to describe goods such as the Products, means that the goods are free of synthetic ingredients. For example, according to a consumer survey, "[e]ighty-six percent of consumers expect a 'natural' label to mean processed foods do not contain any artificial ingredients."[15]

48.    A reasonable consumer's understanding of the term "natural" comports with that of federal regulators and common meaning. That is, the reasonable consumer understands the representation that a product is "natural" to mean that it does not contain any synthetic ingredients.[16]

C.    **The Reasonable Consumers' Interpretation of "Natural" Aligns with Defendants' Interpretation of "Natural"**

---

[14] *Four Companies Agree to Stop Falsely Promoting Their Personal-Care Products as "All Natural" or "100% Natural"; Fifth is Charged in Commission Complaint*, (April 2016), https://www.ftc.gov/news-events/press-releases/2016/04/four-companies-agree-stop-falsely-promoting-their-personal-care (last visited Mar. 17, 2021).

[15] Urvashi Rangan, Comments of Consumers Union on Proposed Guides for Use of Environmental Marketing Claims, 16 C.F.R. Part 260, Notice of the Federal Trade Commission (2010), *available at* https://www.ftc.gov/sites/default/files/documents/public_comments/guides-use-environmental-marketing-claims-project-no.p954501-00289%C2%A0/00289-57072.pdf (also accessible as Comment 58 at http://www.ftc.gov/policy/publiccomments/initiative-353).

[16] Butler and Vossler, *supra* note 8. "The vast majority of respondents stated a belief that 'natural' signals no artificial flavors, colors and/or preservatives." *Id.*

GOOD GUSTAFSON AUMAIS LLP

49.     Defendants are aware that reasonable consumers interpret "natural" to mean that a product is devoid of synthetic ingredients.

50.     This is consistently shown with Defendants' public statements, behavior, and marketing.

51.     For example, the Oars + Alps official Facebook Page routinely shares and quotes articles that refer to the Products as all-natural, "natural," and containing natural ingredients.



a.

GOOD GUSTAFSON AUMAIS LLP



b.

52.    Additionally, numerous profiles of the brand and its founders refer to

the Products' "natural" composition:

a.    "To dig deeper into the story behind this venture and how it is redefining

the men's skincare with its powerful product line based on all-natural

ingredients, we sat down with Mia Saini, and here's what she has to

say."[17]

b.    "When her husband started using many of the products she had brought

home, she started thinking: is there an affordable skin care brand that is

made just for men with all natural ingredients?"[18]

---

[17] AS Pioneer, *Mia Saini Duchnowski: Revolutionizing the men's grooming industry*, https://aspioneer.com/mia-saini-revolutionizing-the-mens-grooming-industry/.

[18] Monica + Andy, *60 Mia Duchnowski - The Cofounder of Oars & Alps on Jumping In and Taking Risks*, https://monicaandandy.com/blogs/ma-edit/mia-duchnowski.

**c.** "BEHIND THE BRAND: OARS + ALPS OFFERS ALL-NATURAL AND AFFORDABLE SKIN CARE PRODUCTS FOR MEN"[19]

**d.** "Once the founders had settled on the all-natural ingredients for their core products, they teamed with a manufacturer that also works with other premium skincare companies such as Kiehl's, L'Oreal and Lancome to produce their core products."[20]

**e.** "Founders Laura Lisowski Cox and Mia Saini Duchnowski developed the line after being frustrated with their inability to find affordable, all-natural yet effective products to suit their husbands' active lifestyles."[21]

**f.** "The brand uses all-natural ingredients to create mostly solid products in stick form that are spill-proof and TSA-approved."[22]

**g.** "Mia started this men's skincare line with all natural ingredients with her husband in mind."[23]

---

[19] Kirk, Kamala, *BEHIND THE BRAND: OARS + ALPS OFFERS ALL-NATURAL AND AFFORDABLE SKIN CARE PRODUCTS FOR MEN*, SPA & BEAUTY TODAY (Jan. 17, 2021), https://spaandbeautytoday.com/articles/behind-the-brand-oars-alps-offers-all-natural-and-affordable-skin-care-products-for-men.

[20] Lazare, Lewis, *Two female entrepreneurs dive into men's skincare with Oars + Alps launch*, CHICAGO BUSINESS JOURNAL (Jan. 31, 2017), https://www.bizjournals.com/memphis/bizwomen/news/latest-news/2017/01/two-female-entrepreneurs-dive-into-mens-skincare.html.

[21] Love, James, *ACTIVE GUY ABOUT YOUR SKINCARE? MEET THE AFFORDABLE OARS + ALPS*, CASSIUS, https://cassiuslife.com/44530/oars-and-alps-skincare/.

[22] Ismael, Amir, *I tried this up-and-coming natural skincare line made for for active men — the products are affordable and effective, and the nice packaging is a bonus*, BUSINESS INSIDER (May 19, 2020), https://www.insider.com/guides/beauty/oars-and-alps-skincare-review.

[23] Odusanwo, Yewande, *EPISODE 1: TAKE TO THE OARS -AND ALPS*, Zora Digital (Jan. 23, 2019), https://zora.digital/ztalks/podcast-episode-1-oars-and-alps/.

CLASS ACTION COMPLAINT

GOOD GUSTAFSON AUMAIS LLP

**h.** "Saini and Lisowski Cox left their high-profile jobs in the spring of 2015 to create Oars + Alps, a men's skincare line that offers affordable, all natural products."[24]

**i.** "...enabling men to groom themselves and keep care of their skin in an all-natural way."[25]

53.   The Defendants also produce Youtube videos that examine the composition of competing products that contain "synthetic" and "harsh" ingredients.[26]



**a.**



**b.**

[24] Elkins, *supra* note 3.

[25] PitchBook, *Oars* + Alps, https://pitchbook.com/profiles/company/179597-98.

[26]  Oars + Alps Official Youtube Channel, *Does natural deodorant work? How to choose the best natural deodorant for you*, (Nov. 4, 2020), https://www.youtube.com/watch?v=_6zxn40ogBk.

GOOD GUSTAFSON AUMAIS LLP

54. The reasonable consumer's understanding of "natural" also comports with the understanding of the brand's founders:

    a. "We searched high and low for all-natural men's skincare options, but everything was too expensive, overly clinical, tailored to women, or just plain inconvenient to buy."[27]

55. At every step of the way, Defendants want consumers to believe that the Products are "natural." They reference the "natural" characteristics at every detailed step including the URL for the Oars + Alps web store.

oarsandalps.com/collections/all-natural-skin-care

## D. **Defendants Represent that the Products are Natural**

56. Defendants capitalize on consumers' preferences for natural products by making representations to consumers on its Products that they are natural.

57. The front label of every Product states that the Product is "Natural."

58. The following image is an example of that representation being prominently made on the front of three of the Products:

[27] Lauletta, Tyler, *Two women created a company aimed at changing the way guys think about skincare*, BUSINESS INSIDER ( Mar. 21, 2017), https://www.businessinsider.com/guides/oars-alps-skincare-review-2017-3.

GOOD GUSTAFSON AUMAIS LLP



59.    Based on the language that appears on the front of each product, Plaintiff reasonably believed that Products contained only natural ingredients.

60.    "Natural" is a representation to a reasonable consumer that the Products contain only natural ingredients.

61.    Throughout its marketing efforts, Defendants reinforce that the Products are "natural."

62.    For example, the Oars + Alps official website makes numerous references to the Products "Natural" composition:

**Are your products natural?**

a.    Yes! Our products use unprocessed ingredients sourced from the earth that are free of parabens, phthalates, sulfates, glycols, and aluminum.

b.    We use natural ingredients—and not just the stuff that's easy to find!

GOOD GUSTAFSON AUMAIS LLP

GOOD GUSTAFSON AUMAIS LLP

c.



## The yays

The natural ingredients that make us us

d.



> " Love everything about these products...the packaging, application, natural ingredients and results. My skin has never felt and looked better.

Alex D.   **Alex D.** —————
★★★★★

e.

# Stay clean with natural ingredients

We believe in powerful, natural ingredients that deliver real results. No harmful additives, no harsh chemicals, no worries.

**Our Ingredients**

f.

63.    Additionally, social media marketing efforts – including through celebrities like NFL superstar Deandre Hopkins - reinforce the "natural" representations on the Products' labels.



a.

GOOD GUSTAFSON AUMAIS LLP



**b.**

64.     Defendants represent on their Products' labels and through coordinated marketing efforts that the Products are "natural."

### E.   **Defendants' Representations Are False, Misleading, and Deceptive**

65.     Despite representing that the Products are "natural," the Products contain multiple synthetic ingredients.

66.     Thus, Defendants' representations that the Products are "natural" is false, misleading, and deceptive because the Products contain ingredients that are, as set forth and described below, synthetic.[28]

---

[28] Other ingredients in the Products may also be artificial as well. Plaintiff's investigation is ongoing and will seek to amend the Complaint to specify other potential artificial ingredients in the future.

GOOD GUSTAFSON AUMAIS LLP

a. **Phenoxyethanol** is a synthetic substance associated with depressing the central nervous system, vomiting, and diarrhea.[29] This synthetic chemical concerned the FDA, and the agency warned consumers against using on nursing infants because it "can depress the central nervous system" and "may cause vomiting and diarrhea, which can lead to dehydration in infants."[30] Concern for the use of this synthetic ingredient is not restricted to the United States, and after concerns were raised by the European Commission's Scientific Committee on Consumer Safety, France prohibited the labeling and marketing of products containing Phenoxyethanol for use on children that are three years old and younger.[31]

b. **Dimethicone** is a synthetic ingredient.[32]

c. **Caprylyl Glycol** is a synthetic skin conditioning agent and preservative.[33]

---

[29] 21 C.F.R. §172.515 *and FDA Consumer Update: Contaminated Nipple Cream*, (May 2008), https://web.archive.org/web/20140712202507/https://www.fda.gov/ForConsumers/ConsumerUpdates/ucm049301.htm (last visited Mar. 17, 2021).

[30] U.S. Food and Drug Administration, For Consumers, *Contaminated Nipple Cream*, https://web.archive.org/web/20140712202507/https://www.fda.gov/ForConsumers/ConsumerUpdates/ucm049301.htm (last visited Mar. 17, 2021).

[31] Agence Nationale de Sécurité du Médicament et des Produits de Santé, Decision of 13 Mars 2019, *available at* https://www.ansm.sante.fr/content/download/158253/2075101/version/1/file/DPS_Phenoxyethanol-200319.pdf.

[32] 24 No. 3 FDA Advertising & Promotion Manual Newsl. 13.

[33] ¶ 17,483 ABS CONSUMER PRODUCTS, LLC—COMPLAINT AND CONSENT ORDER, FTC DKT. C-4584, FILE NO. 152 3269, ANNOUNCED APRIL 12, 2016; ISSUED JULY 6, 2016., Trade Reg. Rep. P 17483.

GOOD GUSTAFSON AUMAIS LLP

**d. Potassium Sorbate** is a synthetic preservative.[34] It is created by using potassium hydroxide (KOH) to neutralize sorbic acid (C6H802). The resulting potassium sorbate may be crystallized from aqueous ethanol. Studies have shown Potassium Sorbate to have genotoxic effects on humans and other mammals.[35] It causes chromosomal aberrations in cells, which can trigger the development of cancer.[36]

**e. Sodium Benzoate** is a synthetic preservative.[37] Sodium Benzoate is produced by the neutralization of benzoic acid with sodium hydroxide, or by adding benzoic acid to a hot concentrated solution of sodium carbonate until effervescence ceases. The solution is then evaporated, cooled and allowed to crystalize or evaporate to dryness, and then granulated. It does not occur naturally.[38] Sodium Benzoate has been shown to cause DNA damage and chromosomal aberrations.[39] When Sodium Benzoate combines with either Ascorbic Acid or Citric Acid (a combination of ingredients present in some of the Products), the two

---

[34] U.S. Dept. of Agriculture, CFNP TAP Review, *Potassium Sorbate*, https://www.ams.usda.gov/sites/default/files/media/P%20Sor%20technical%20advisory%20panel%20report.pdf and *see* FDA Warning Letter to Bagels Forever (dated 7/22/2011) (available at: http://wayback.archive-it.org/7993/20170112193358/http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2011/ucm265756.htm): "Your product is manufactured with infused wild dry blueberries that contain potassium sorbate, which is listed in 21 CFR 182.3640 as a chemical preservative; therefore, your product may not make the claims 'All Natural' and 'No Preservatives.'"

[35] Sevcan Mamur et al., Does Potassium Sorbate Induce Genotoxic or Mutagenic Effects in Lymphocytes?, TOXICOLOGY IN VITRO 790, 793 (2010).

[36] *Id.*

[37] 21 C.F.R. § 582.3733.

[38] 21 C.F.R. § 184.1733.

[39] N. Zengin et al., The Evaluation of the Genotoxicity of Two Food Preservatives: Sodium Benzoate and Potassium Benzoate, FOOD AND CHEMICAL TOXICOLOGY 763, 764-68 (2011).

1  substances can react to produce benzene, which is a highly toxic

2  carcinogen that causes leukemia.[40]

3     **f.**   **Propanediol** is a synthetic liquid substance that absorbs water.[41]

4     **g.**   **Ethylhexylglycerin** is a synthetic derived form of vegetable glycerin.

5     **h.**   **Citric Acid** is recognized by the FDA and other federal agencies as an

6        artificial substance.[42] Citric acid is added as a synthetic preservative,

7

8  flavorant, and acidity regulator. It is commonly manufactured through

9  solvent extraction or mycological fermentation of bacteria.[43] While the

10  chemical's name has the word "citric" in it, citric acid is not extracted

11

12

13

14  [40] U.S. Food and Drug Administration, *Questions and Answers on the Occurrence of Benzene in Soft Drinks and Other Beverages*, (2018),

15  https://www.fda.gov/food/chemicals/questions-and-answers-occurrence-benzene-soft-drinks-and-other-beverages#q4 (last visited Nov. 16, 2020); *See Gonzalez v. Pepsico,*

16  *Inc.*, 489 F. Supp. 2d 1233, 1238 (D. Kan. 2007): "[P]roducts from defendants which contained sodium benzoate and ascorbic acid, citric acid or erythoribic acid. The Food

17  and Drug Administration ("FDA") has reported that these ingredients may interact to form benzene, a hazardous substance which the Environmental Protection Agency

18  ("EPA") knows to potentially cause anemia, nervous systems disorders and immunosuppression in persons who are exposed..." *and* Robert Snyder, *Leukemia and*

19  *Benzene*, International Journal of Environmental Research and Public Health vol. 9,8 (2012): 2875-93 *and* Lakshmi Narayanan Venu & Anoop Austin, *Study and*

20  *Quantification of Preservative (E211) In Carbonated Soft Drink Samples*, International Organization of Scientific Research Journal of Applied Chemistry vol.

21  12,4 (2019): 17-23 ("Sodium benzoate reacts with citric acid or ascorbic acid to form benzene").

22

23  [41] National Institute of Health's National Library of Medicine, Propylene glycol *available at* https://pubchem.ncbi.nlm.nih.gov/compound/Propylene-glycol (last visited

24  November 21, 2020).

25

26  [42] *See* FDA Informal Warning Letter to the Hirzel Canning Company (August 29, 2001) ("the addition of calcium chloride and citric acid to these products preclude use

27  of the term 'natural' to describe this product."); U.S. International Trade Commission, Synthetic Organic Chemical Index, USCTIC Pub. 2933, at 3-105 (Nov. 1995).

28

[43] 21 C.F.R. § 184.1033(a).

GOOD GUSTAFSON AUMAIS LLP

GOOD GUSTAFSON AUMAIS LLP

from fruit. Rather, it is industrially manufactured by fermenting genetically modified strains of the black mold fungus *Aspergillus niger*.[44]

67.    Consumers lack the meaningful ability to test or independently ascertain or verify whether a product is natural, especially at the point of sale. Consumers would not know that the Products contain unnatural, synthetic ingredients, by reading the ingredients label.

68.    Discovering that the ingredients are not natural and are actually synthetic requires an investigation beyond that of the skills of the average consumer. That is why, even though the ingredients listed above are identified on the back of the Products' packaging in the ingredients listed, the reasonable consumer would not understand – nor are they expected to understand – that these ingredients are synthetic.

69.    Moreover, the reasonable consumer is not expected or required to scour the ingredients list on the back of the Products in order to confirm or debunk Defendants' prominent front-of-the-product claims, representations, and warranties that the Products are "natural."

70.    Defendants did not disclose that the above listed ingredients are synthetic ingredients anywhere on the product. A reasonable consumer understands Defendants' "natural" claims to mean that the Products are "natural" and do not contain synthetic ingredients.

---

[44] *See, e.g.*, Belen Max, et al. *Biotechnological Production of Citric Acid*, BRAZILIAN JOURNAL OF MICROBIOLOGY, 41.4 Sao Paolo (Oct./Dec. 2010) and Sweis, Iliana E, and Bryan C Cressey. *Potential role of the common food additive manufactured citric acid in eliciting significant inflammatory reactions contributing to serious disease states: A series of four case reports*, TOXICOLOGY REPORTS, 5.808 ( Aug. 9 2018).

71.     Consumers rely on label representations and information in making purchasing decisions.

72.     The marketing of the Products as "natural" in a prominent location on the labels of all of the Products, throughout the Class Period, evidences Defendants' awareness that "natural" claims are material to consumers.

73.     Additionally, Defendants are aware that products containing synthetic ingredients have lower demand and exploit reasonable consumers by projecting that the Products are "natural" and free of synthetic, bad ingredients.

    **a.** Co-Founder Mia Duchnowski: "We want to be the go-to brand for natural men's skincare. Skincare without the toxins and without all the bad ingredients."[45]

    **b.** Co-Founder Laura Lisowski Cox: "Kiehl's is very expensive. They wear these lab coats and act like there are all these great ingredients, but there are actually really poor ingredients. We wanted to create something better."[46]

74.     Defendants' deceptive representations are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

75.     Plaintiff and the Class Members reasonably relied to their detriment on Defendants' misleading representations and omissions.

---

[45] Siegel, *supra* note 4, at approximately the 42:40 timestamp.
[46] McCormack, *supra* note 6.

GOOD GUSTAFSON AUMAIS LLP

76. Defendants' false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers, as they have already deceived and misled the Plaintiff and the Class Members.

F. **Defendants' Deceptive Conduct Caused Plaintiff's and Class Members' Injuries**

77. In making the false, misleading, and deceptive representations and omissions described herein, Defendants knew and intended that consumers would pay a premium for Products labeled "natural" over comparable products not so labeled and marketed.

78. This consumer focus on "natural" products and the associated premium that can be captured has always been the brand's target.

a. Co-Founder Mia Duchnowski: "…[O]ur product [costs] more than double the drugstore product. We have natural ingredients. Not every zip code wants those type of products, or lend itself to being our target consumer."[47]

b. Co-Founder Laura Lisowski Cox: "It's premium formulations, but at a more approachable price point."[48]

79. As an immediate, direct, and proximate result of Defendants' false, misleading, and deceptive representations, Defendants injured the Plaintiff and the Class Members in that they:

a. Paid a sum of money for Products that were not what Defendants represented;

---

[47] Siegel, *supra* note 4, at approximately the 34:34 timestamp.
[48] McCormack, *supra* note 6.

GOOD GUSTAFSON AUMAIS LLP

GOOD GUSTAFSON AUMAIS LLP

 **b.** Paid a premium price for Products that were not what Defendants represented;

 **c.** Were deprived of the benefit of the bargain because the Products they purchased were different from what Defendants warranted; and

 **d.** Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendants represented.

 80. Plaintiff and the Class Members paid for Products that were "natural" but received Products that were not "natural." The products Plaintiff and the Class Members received were worth less than the products for which they paid.

 81. Based on Defendants' misleading and deceptive representations, Defendants were able to, and did, charge a premium price for the Products over the cost of competitive products not bearing the misrepresentations.

 82. Plaintiff and the Class Members paid money for the Products. However, Plaintiff and the Class Members did not obtain the full value of the advertised Products due to Defendants' misrepresentations and omissions. Plaintiff and the Class Members purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products. Consequently, Plaintiff and the Class Members have suffered injury in fact and lost money as a result of Defendants' wrongful conduct.

 83. Defendants knew that consumers will pay more for a product marketed as "natural," and intended to deceive Plaintiff and putative Class Members by labeling and marketing the Products as purportedly natural products.

 84. Plaintiff and Class Members paid for the Products over and above comparable products that did not purport to be "natural." Given that Plaintiff and

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GOOD GUSTAFSON AUMAIS LLP

Class Members paid for the Products based on Defendants' misrepresentations that they are "natural," Plaintiff and Class Members suffered an injury in the amount paid.

85.     Additionally, Plaintiff and Class Members paid a premium for the Products over and above comparable products that did not purport to be "natural." Given that Plaintiff and Class Members paid a premium for the Products based on Defendants' misrepresentations that they are "natural," Plaintiff and Class Members suffered an injury in the amount of the premium paid.

## CLASS DEFINITIONS AND ALLEGATIONS

86.     Plaintiff, pursuant to Federal Rule of Civil Procedure 23, brings this action on behalf of the following classes (collectively, the "Class," "Classes," and "Class Members"):

   a. California Class: All persons who purchased Defendants' Products within the State of California and within the applicable statute of limitations period; and

   b. Nationwide Class: All persons who purchased Defendants' Products within the United States and within the applicable statute of limitations period.

87.     Excluded from the Classes are Defendants, their parents, subsidiaries, affiliates, officers, and directors, those who purchased the Products for resale, all persons who make a timely election to be excluded from the Classes, the judge to whom the case is assigned and any immediate family members thereof, and those who assert claims for personal injury.

88.     The members of the Classes are so numerous that joinder of all Class Members is impracticable. Defendants have sold, at a minimum, millions of units of the Products to Class Members.

89.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the putative classes that predominate over questions that may affect individual Class Members include, but are not limited to the following:

    a.  whether Defendants misrepresented material facts concerning the Products on the label of every product;

    b.  whether Defendants' conduct was unfair and/or deceptive;

    c.  whether Defendanst have been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendants to retain the benefits conferred upon them by Plaintiff and the Classes;

    d.  whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;

    e.  whether Defendants breached express and implied warranties to Plaintiff and the Classes;

    f.  whether Plaintiff and the classes have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

90.     Plaintiff's claims are typical of those of other Class Members because Plaintiff, like all members of the Classes, purchased Defendants' Products bearing the natural representations and Plaintiff sustained damages from Defendants' wrongful conduct.

GOOD GUSTAFSON AUMAIS LLP

91.     Plaintiff will fairly and adequately protect the interests of the Classes and has retained counsel that is experienced in litigating complex class actions. Plaintiff has no interests which conflict with those of the classes.

92.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, making it impracticable for Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

93.     The prerequisites to maintaining a class action for equitable relief are met as Defendants have acted or refused to act on grounds generally applicable to the classes, thereby making appropriate equitable relief with respect to the classes as a whole.

94.     The prosecution of separate actions by members of the classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. For example, one court might enjoin Defendants from performing the challenged acts, whereas another might not. Additionally, individual

GOOD GUSTAFSON AUMAIS LLP

actions could be dispositive of the interests of the classes even where certain Class Members are not parties to such actions.

## COUNT I
### Violation of California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE §§ 17200, et seq.

95.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.     Plaintiff brings this Count individually and on behalf of the members of the California Class.

97.     Defendants are subject to California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

98.     Defendants violated the "unlawful" prong of the UCL by violating California's Consumer Legal Remedies Acts ("CLRA")  and False Advertising Law ("FAL"), as alleged herein.

99.     Defendants' misrepresentations and other conduct, described herein, violated the "unfair" prong of the UCL in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits.

100.    Defendants violated the "fraudulent" prong of the UCL by misrepresenting that the Products are "natural" when, in fact, they are made with synthetic ingredients.

101.    Plaintiff and the California Class Members lost money or property as a result of Defendants' UCL violations because: because: (a) they would not have

GOOD GUSTAFSON AUMAIS LLP

purchased the Products on the same terms if they knew that the Products were made with synthetic ingredients (b) they paid a substantial price premium compared to other cosmetic products due to Defendants' misrepresentations; and (c) the Products do not have the characteristics, uses, or benefits as promised.

102.   In accordance with Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

103.   Plaintiff and the California Class also seek an order for the restitution of all monies from the sale of the Products, which were unjustly acquired through acts of unlawful competition.

104.   Because Plaintiff and the California Class Members' claims under the "unfair" prong of the UCL sweep more broadly than their claims under the FAL, CLRA, or UCL's "fraudulent" prong, Plaintiff's legal remedies are inadequate to fully compensate Plaintiff for all of Defendants' challenged behavior.

**COUNT II**
**Violation of The False Advertising Law ("FAL"),**
**CAL. BUS. & PROF. CODE §§ 17500, et seq.**

105.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

106.   Plaintiff brings this Count individually and on behalf of the members of the California Class.

107.   California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq., makes it "unlawful for any person to make or disseminate or cause to be made or

disseminated before the public in this state, ... in any advertising device ... or in any other manner or means whatever, including over the Internet, any statement, concerning ... personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

108.    Defendants committed acts of false advertising, as defined by §§17500, *et seq.*, by misrepresenting that the Products are "natural" when they are not.

109.    Defendants knew or should have known through the exercise of reasonable care (i.e. pre-market testing) that its representations about the Products were untrue and misleading.

110.    Defendants' actions in violation of §§ 17500, *et seq.* were false and misleading such that the general public is and was likely to be deceived.

111.    Plaintiff and the California Class Members lost money or property as a result of Defendants' FAL violations because: (a) they would not have purchased the Products on the same terms if they knew that the Products were made with synthetic ingredients; (b) they paid a substantial price premium compared to other cosmetic products due to Defendants' misrepresentations; and (c) the Products do not have the characteristics, uses, or benefits as promised.

112.    Defendants profited from the sale of the falsely and deceptively advertised Products to unwary consumers.

113.    As a result, Plaintiff, the California Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendants were unjustly enriched.

GOOD GUSTAFSON AUMAIS LLP

114.   Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff, on behalf of herself and the California Class, seeks an order enjoining Defendants from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

115.   Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA, and restitution is not limited to returning to Plaintiff and California Class Members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

## COUNT III
## Violation of The Consumer Legal Remedies Act ("CLRA"),
## CAL. CIV. CODE §§ 1750, et seq.

116.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

117.   Plaintiff brings this Count individually and on behalf of the members of the California Class.

118.   This cause of action is brought pursuant to California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 (the "CLRA").

119.   Plaintiff and the other members of the Classes are "consumers," as the term is defined by California Civil Code § 1761(d), because they bought the Products for personal, family, or household purposes.

GOOD GUSTAFSON AUMAIS LLP

CLASS ACTION COMPLAINT

120.    Plaintiff, the other members of the Classes, and Defendants have engaged in "transactions," as that term is defined by California Civil Code § 1761(e).

121.    The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by Defendants in transactions intended to result in, and which did result in, the sale of goods to consumers.

122.    As alleged more fully above, Defendants have violated the CLRA by falsely representing to Plaintiff and the other members of the Classes that the Products are "natural" when in fact they are made with synthetic ingredients.

123.    As a result of engaging in such conduct, Defendants have violated California Civil Code § 1770(a)(5), (a)(7) and (a)(9).

124.    Pursuant to the provisions of Cal. Civ. Code § 1782(a), Plaintiff provided notice to Defendants of its alleged violations of the CLRA, demanding that Defendants correct such violations, and providing it with the opportunity to correct its business practices. Notice was sent via certified mail, return receipt requested on May 26, 2022. As of the date of filing this complaint, Defendants have not responded. Accordingly, if after 30 days no satisfactory response to resolve this litigation on a class-wide basis has been received, Plaintiff will seek leave to amend this request to seek restitution and actual damages as provided by the CLRA.

125.    Pursuant to California Civil Code § 1780, Plaintiff seeks injunctive relief, reasonable attorneys' fees and costs, and any other relief that the Court deems proper.

**COUNT IV**
**Unjust Enrichment**

126.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

127.   Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against the Defendants.

128.   At all times relevant hereto, Defendants deceptively marketed, advertised, and sold merchandise to Plaintiff and the Classes.

129.   Plaintiff and members of the Classes conferred upon Defendants nongratuitous payments for the Products that they would not have if not for Defendants' deceptive advertising and marketing. Defendants accepted or retained the nongratuitous benefits conferred by Plaintiff and members of the Classes, with full knowledge and awareness that, as a result of Defendants' deception, Plaintiff and members of the Classes were not receiving a product of the quality, nature, fitness, or value that had been represented by Defendants and reasonable consumers would have expected.

130.   Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff's and Class Members' purchases of the Products. Retention of those monies under these circumstances is unjust and inequitable because of Defendants' misrepresentations about the Products, which caused injuries to Plaintiff and Class Members because they would not have purchased the Products if the true facts had been known.

131.   Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiff and members of the Classes is unjust and inequitable, Defendants

GOOD GUSTAFSON AUMAIS LLP

must pay restitution to Plaintiff and members of the Classes for their unjust enrichment, as ordered by the Court.

## RELIEF DEMANDED

132.   WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

    a.   For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Classes and Plaintiff's attorneys as Class Counsel to represent the members of the Classes;

    b.   For an order declaring the Defendants' conduct violates the statutes and laws referenced herein;

    c.   For an order awarding, as appropriate, compensatory and monetary damages, statutory damages, restitution or disgorgement to Plaintiff and the Classes for all causes of action;

    d.   For an order requiring Defendants to immediately cease and desist from selling their misbranded Products in violation of law; enjoining Defendants from continuing to label, market, advertise, distribute, and sell the Products in the unlawful manner described herein; and ordering Defendants to engage in corrective action;

    e.   For prejudgment and postjudgment interest on all amounts awarded;

    f.   For an order awarding punitive damages; and

       For an order awarding attorneys' fees and expenses and costs of suit

GOOD GUSTAFSON AUMAIS LLP

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all causes of action so triable.

Dated: June 1, 2022

**GOOD GUSTAFSON AUMAIS LLP**

*/s/   J. Ryan Gustafson*
J. Ryan Gustafson (Cal. Bar No. 220802)
2330 Westwood Blvd., No. 103
Los Angeles, CA 90064
Tel: (310) 274-4663
jrg@ggallp.com

**SHENAQ PC**

/s/ Amir Shenaq
Amir Shenaq, Esq.*
3500 Lenox Road, Ste 1500
Atlanta, GA 30326
Tel: (888) 909-9993
amir@shenaqpc.com

**THE KEETON FIRM LLC**

/s/ Steffan T. Keeton
Steffan T. Keeton, Esq.*
100 S Commons Ste 102
Pittsburgh PA 15212
Tel: (888) 412-5291
stkeeton@keetonfirm.com

*Pro hac vice forthcoming*

*Counsel for Plaintiff and the Proposed Class*